

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| EDWARD SCANLON, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 03 C 4383 |
| ) | |
| CHICAGO TRANSIT AUTHORITY, ) | Judge John W. Darrah |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Edward Scanlon, filed suit against Defendant, the Chicago Transit Authority, alleging race and age discrimination. Currently before the Court is the CTA's Motion for Summary Judgment.

## BACKGROUND

Scanlon was hired by the CTA as a combined rail operator on April 24, 1995. (Def.'s 56.1(a)(3) Statement ¶ 5). Combined rail operators at the CTA are responsible for motoring CTA rail trains. (Id., ¶ 6). As a combined rail operator, Scanlon was a member of Amalgamated Transit Union, Local 308, throughout his employment with the CTA. (Id., ¶ 7). Scanlon was aware that the CTA and Local 308 have a grievance procedure that is outlined in the collective bargaining agreement between the CTA and Local 308. (Id., ¶ 8).

The CTA's General Rule Book Governing All Employees prohibits certain types of personal conduct. The conduct prohibited by the Rule Book includes conduct unbecoming an employee; use of obscene or abusive language in public; and disrespect to supervisory personnel, co-workers or the public. (Def.'s 56.1(a)(3) Statement ¶ 9). The Rule Book also requires CTA employees to use their "best judgment" when selecting a course of action in a situation not covered by the Rule Book. (Id.,

¶ 10). Scanlon signed a Rule Book receipt, acknowledging that he had received a copy of the Rule Book on April 12, 1995. (Id., ¶ 11). The CTA's Corrective Action Guidelines allow for immediate discharge of employees who violate the CTA's rules regarding behavior. (Id., ¶ 12). Scanlon received a copy of these Guidelines. (Id., ¶ 13).

Beginning in 1995, Scanlon worked on the CTA's Red Line. (Def.'s 56.1(a)(3) Statement ¶ 14). On June 6, 2001, Scanlon was issued a final written warning and corrective case interview as a result of absenteeism in the prior twelve months. (Id., ¶ 21). On December 12, 2001, Scanlon was issued a suspension notice and instructed to report to the General Manager's office. (Id., ¶ 22). On December 21, 2001, during his discharge hearing, General Manager Robert Takagi went through each absence and gave Scanlon an opportunity to explain each absence. (Id., ¶ 23). At the meeting, neither Scanlon nor his union representative alleged that Scanlon was being disciplined because of his race or that Ron Heard, an African American Manager, recommended Scanlon's discharge because of Scanlon's race. (Id., ¶ 73). In lieu of discharge, Takagi placed Scanlon on probation, suspended Scanlon and instructed him that more than one instance of absenteeism during his probationary period would warrant immediate discharge. (Id., ¶ 24).

On or about February 26, 2002, Scanlon, Local 308, and the CTA signed a settlement agreement under which Scanlon was allowed to transfer from the CTA's Red Line to the CTA's Orange Line without having to formally post for the position pursuant to the Local 308 and the CTA contract. (Id., ¶ 15). Under the settlement agreement, Scanlon waived any and all claims related to his transfer. (Id., ¶ 16).

From February 2002 until his discharge on May 1, 2002, Scanlon worked on the CTA's Orange Line. (Def.'s 56.1(a)(3) Statement ¶ 17). In April 2002, Scanlon worked under the

management of William Platt, the General Manager of the CTA's Brown, Green, and Orange Lines. As the General Manager, Platt was responsible for the oversight of all aspects of rail operations, including employee discipline. (Id., ¶¶ 18-19).

On April 12, 2002, Scanlon was removed from service. (Def.'s 56.1(a)(3) Statement ¶ 25). That same day, Scanlon contacted the Equal Employment Office for assistance regarding his alleged discrimination. (Plaint.'s 56.1(b)(3) Statement ¶ 18).

On April 16, 2002, Thomas Reilly, a Caucasian CTA manager, instructed Scanlon to report to the General Manager's office on May 1, 2002, for further disposition and issued Scanlon a suspension notification. (Def.'s 56.1(a)(3) Statement ¶ 26). Scanlon believes Reilly suspended him on April 16, 2002, due to his race, because Scanlon levied the "same charges" against African-American employees but his complaints were "not recognized." (Id., ¶ 27).

On or about April 22, 2002, Platt received a memorandum from Reilly recommending Scanlon's discharge. Attached to the memorandum were copies of Scanlon's interview records, Scanlon's work history, and transcripts of Scanlon's phone messages left on the voice mail of Alenda Curtis, an employee in the CTA's Affirmative Action Union, in April 2002. (Def.'s 56.1(a)(3) Statement ¶ 28). Platt reviewed the discharge memorandum and its accompanying documents. The transcripts of the voice messages left by Scanlon contained "numerous disparaging remarks about co-workers and management, contained obscenities, and references to violence and violent conduct." Platt also listened to the recorded voice mail messages and confirmed the accuracy of the transcripts of Plaintiff's messages. (Id., ¶ 29). The main factors in Platt's decision to discharge Scanlon were Scanlon's violations of the CTA rules concerning employees' conduct and behavior and Platt's belief that Scanlon's conduct and statements were intended to intimidate another

3

employee and to disparage other co-workers and managers. Platt's decision to discharge Scanlon was not based on Scanlon's race, age or any complaints that Scanlon made to the CTA's Affirmative Action Department. (Id., ¶ 31).

Scanlon's voice mail messages left for Curtis stated:

> Alenda, this is Ed Scanlon, as soon as you check your voice mail now this morning, please call me back. .... This is getting pushed to the side again. Like the union did it, I mean come on. The thing is, Jefferey I can get the evidence on, but Charlie Brown and Takagi ignoring two physical assaults, I'm telling you they got to go. Matter of fact, I'm getting in trouble at Midway left and right now because I am not treated as an equal. Listen, because I am a white man, that doesn't have their job, they're going to keep hammering me. If I was a white man that had their job or superior they will think of me as an equal. Next, it will be like jail, people will want to be fucking you in the ass and they'll be saying it's all right. As long as you're white, you're under. They're never going to lay off. You've got to give me a chance. I want to be treated as an equal. I want equal job or I want them fired. It must be like this. They can't keep doing this.
>
> Alenda, it's Ed Scanlon, you don't know how urgent this is. They are transferring Ron Heard out here to Midway, the manager. He overheard me talking to my Union Rep, Marilyn Perkins. I said because of that Jefferey that's where it all started, that's where it's got to end. That these managers would let a supervisor rape a woman as long as they keep the railroad running they don't care. Now you guys violated my rights, I don't think Heard's coming out here with a check for the eight days he screwed me out of. I think he's coming out here to fire me. Listen, you got to do something, the clock is ticking. They change the 15[th]. You've got to do something. I just fought for 22 months to get transferred away from that stuff. They're putting him over here to fire me. Look, now the reason with Jefferey, he threatened me. I went about this non-violent. Somebody's got to help me. I'm begging for help. I've gone through every avenue there is. Now I'm coming to you. I thought this is your job. It's management this guy is coming here to fire me. I'm in the process of getting my money back. I don't think he wants a bad mark on his record, because they will not admit error. Listen, somebody's got to help me. I never one time in my life when my rights were violated and I stood up and I fought for it I was shot. But I won. I took a

4

> bullet right almost in the head. I blocked though. And something like that is going to happen this time. So help me God. Help me out. I don't know if I can do this alone. Help me out. Call me. Get a conference going with Takagi, Brown, all right. Please do something. The clock's ticking. I know I'm going to be fired. I know I am going to be killed or something. When they violate your rights they'll stop at (tape ends).
>
> Hello, it's Ed Scanlon. Look, I put my heart and soul into this job and got nothing but my teeth kicked in. Now somebody got to stand up for what's right and what's wrong. I don't think I can do this on my own. If this would have been taken care of two years ago, you wouldn't have a mad man up at Fullerton. I'm telling you, Heard was told to put me down by Takagi because I stand up for my rights. I'm considered a trouble maker. Now this ain't right. Something's got to be done. Please call me as soon as you get in today. Or else, tell me, please tell me, who I can talk to. (end of audible tape).

(Plaint.'s 56.1(b)(3) Statement ¶¶ 28-30).

On May 1, 2002, Platt held a disciplinary hearing with Scanlon, who was accompanied by two union representatives. At the hearing, Platt read the discharge recommendation to Scanlon and the union representatives; neither Scanlon nor the union representatives denied the contents of the voice mail messages. Platt presented Scanlon with a notice of discharge, which contained a list of the CTA rules that Scanlon was charged with violating as a result of the contents of his voice mail messages left for Curtis. (Def.'s 56.1(a)(3) Statement ¶ 32). Platt also gave Scanlon and the union representatives an opportunity to speak on Scanlon's behalf; neither Scanlon nor the union representatives presented any reason to persuade Platt to change his decision to discharge Scanlon. (Id., ¶ 33). Scanlon was discharged from his employment with the CTA on May 1, 2002. (Id., ¶ 34).

On September 20, 2002, Scanlon filed a charge with the Equal Employment Opportunity Commission and the Illinois Department of Human Rights. The EEOC charge has an "X" in the box indicating that race is a basis for the charge but does not have an "X" in the box indicating that age

or retaliation are bases of the charge. (Def.'s 56.1(a)(3) Statement ¶ 36). The charge indicates the date the discrimination took place as "03/29/02" and does not indicate that it was a "continuing action." (Id., ¶ 37).

The charge alleged that Scanlon began working for the CTA on or about April 24, 1995, and that Scanlon's most recent position was a rail operator. (Def.'s 56.1(a)(3) Statement ¶ 38). The charge alleged that, since January 2001, Scanlon complained to management about physical threats of harm and harassment by a supervisor, who is black, but "management refused to take any action" to address his complaint. (Id., ¶ 39). The charge also alleged that on March 29, 2002, Scanlon contacted the CTA's Affirmative Action Department regarding his complaint. The charge further alleged that Scanlon was suspended for several weeks without pay and that the CTA refused to address Scanlon's "concerns" and terminated Scanlon's employment on May 1, 2002. (Id., ¶ 40).

Scanlon also completed and signed an EEOC Charge Questionnaire, dated September 20, 2002, in which he circled "race" and "color" as the bases for his charge. While "age" was offered in the questionnaire as an optional basis for a charge of discrimination, Scanlon did not circle "age" or otherwise indicate that age discrimination formed a basis of his charge. (Id., ¶ 42). Scanlon also circled discharge and harassment as the issues that formed the basis of his charge on the questionnaire. Scanlon initially circled the issue "transfer," but the circle was scribbled out. While "failure to promote" was offered in the questionnaire as an optional issue that could give rise to a charge of discrimination, Scanlon did not circle failure to promote or otherwise indicate that failure to promote was an issue upon which Scanlon's charge was based. (Id., ¶ 43).

On June 24, 2003, Scanlon filed a *pro se* Complaint, alleging race discrimination. (Def.'s 56.1(a)(3) Statement ¶ 45). Scanlon's Complaint alleged that the CTA "discriminated against the

plaintiff on or about, or beginning on or about, June 8, 2000." (Id., ¶ 47). It further alleged that the CTA "failed to address physical attack by a C.T.A. Rail Supervisor. (2 occasions). The supervisor who is black was reported to a manager who is also black." Facts supporting Scanlon's claim of discrimination were that "the supervisor was not disciplined according to C.T.A. policy, but was interviewed for a promotion to management by the manager. I believe the manager rewarded and supported the supervisor's conduct." Scanlon's Complaint did not allege race discrimination or that the CTA terminated Scanlon or failed to promote Scanlon. (Id., ¶¶ 49-50).

On November 12, 2003, Scanlon, through counsel, filed an Amended Complaint. (Def.'s 56.1(a)(3) Statement ¶ 51). Scanlon's Amended Complaint alleges both race and age discrimination. (Id., ¶ 52). In the Amended Complaint, Scanlon alleges that he was not transferred to another position within the CTA even after many requests to do so and that he was "continually verbally harassed" by an unnamed "rail supervisor" who allegedly "physically attacked him regarding African American CTA employees having to endure the same treatment as he had for many years." (Id., ¶ 53). Scanlon alleges that he was denied promotions "due to his demand for action on the part of CTA against the supervisor who had physically struck him and verbally harassed him from June 8, 2000 until termination." He also alleges that the CTA assigned younger African American employees to positions that he had requested. (Id., 54). The Amended Complaint further alleges that he was retaliated against because he contacted the CTA's internal Affirmative Action Department in June 2001 and on March 29, 2002. (Id., 57).

At Scanlon's deposition, Scanlon testified that the CTA supervisors or managers that discriminated against him while he worked on the CTA's Red Line included: Takagi,

7

Charles Brown, Ron Heard, Marion Jefferey, William Mooney, Chester Kidd, Carol Davis, Freddie Edwards, Sabrina Anthony, Charles Lindenmuth, Fred Schein, and Ulysses Coley. (Def.'s 56.1(a)(3) Statement ¶ 59).

As to Jefferey, on June 8, 2000, Jefferey "exploded" at Scanlon, swinging his arms and stated "is that you again" on the Platform at the CTA's 95th Street train terminal at a supervisor's booth when Scanlon repeated a question to Jefferey. Prior to this incident, Jefferey was observed being "friendly" with African-American co-workers. (Def.'s 56.1(a)(3) Statement ¶¶ 61, 88). Jefferey did not make any reference to Scanlon's race during the incident. (Id., ¶ 91). However, Scanlon believes Jefferey's actions occurred because of Scanlon's race because Jefferey "had rage, a look of hatred that he didn't have with the employees he was just talking to, and he had it when he was saying to me." (Id., ¶ 92). Brown did not issue a written warning or written reprimand to Jefferey. (Plaint.'s 56.1(b)(3) Statement ¶ 14).

Scanlon reported the incident to the CTA Managers Kidd and Brown. Takagi and Brown testified that Scanlon had reported to them that Jefferey had "yelled" at Scanlon. Scanlon, Kidd, Brown, and Jefferey met after the incident for thirty minutes. During the meeting, Jefferey denied that he had yelled at Scanlon but had stated that "it's rough out there, we had to deal with it for years, it is about time you start dealing with it." (Def.'s 56.1(a)(3) Statement ¶¶ 62, 95-96). During the meeting, Brown asked Scanlon and Jefferey whether they could work together, to which both responded they could. Scanlon and Jefferey shook hands and went back to work. (Id., ¶ 98). Scanlon did not indicate at the meeting that anyone other than Jefferey discriminated against him. (Id., ¶ 99).

8

Scanlon further testified of another incident in September 2001 at the CTA's Roosevelt station on the CTA's Red Line. At that time, Jefferey approached Scanlon "excitedly" and "in a threatening manner" and stated, "What kind of run is this?" Scanlon "jerked back" and told Jefferey his run number, and Jefferey repeated the run number several times "screaming and yelling" at Scanlon. (Id., ¶¶ 63, 103). Scanlon filed a report about the incident, but Brown and Takagi initially denied having received the report. After Scanlon sent a facsimile copy to Brown, Brown and Scanlon met regarding the incident. At the meeting, Brown told Scanlon that Brown would not address his concerns but later stated that he would talk to Jefferey. Brown further told Scanlon that Scanlon did not like black supervisors and that Scanlon "didn't have it as bad as he did years ago when he had to stay out of service when instruction and management were predominately white." (Id., ¶ 64). Brown denied making the comments. (Id., ¶ 78). Brown instructed Jefferey to avoid Scanlon "at all costs," not to board Scanlon's trains, and not to have any conversations with Scanlon. Brown received no other complaints from Scanlon about Jefferey. (Id., ¶ 106).

Scanlon had a third encounter with Jefferey while Scanlon was driving a CTA train between the North/Clybourn and Clark/ Division subway stations. This time, Jefferey was down on the track and signaled that he wanted to be picked up. Scanlon stopped the train, opened the door, and let Jefferey into the train. Jefferey came into the motor cab and stated that he was surprised Scanlon picked him up. Scanlon responded that "I'll do anything for you as long as you don't have some kind of tantrum and start screaming at me." (Def.'s 56.1(a)(3) Statement ¶¶ 109-112). Jefferey responded by smiling and rocking back and forth. (Id., ¶ 112). Scanlon believes this incident was related to his race because of Jefferey's demeanor, including the fact that Jefferey had a "smirk" during the incident. (Id., ¶ 113). Some time later, Brown asked Scanlon if he had been in contact

9

with Jefferey since the September 2001 incident. Scanlon informed Brown that Jefferey had boarded Scanlon's train and "looked at him." (Id., ¶ 115). Brown did not discipline Jefferey because part of Jefferey's position is to board trains. (Id., ¶ 116). Scanlon told Brown that he felt unsafe and that he deserved a transfer for his safety. (Plaint's 56.1(b)(3) Statement ¶ 1). At one point, Brown told Scanlon that when he "started 25 years ago, instruction supervision, everyone was white, and you stayed out of service without pay until they felt like qualifying you for a job." He told Scanlon that Scanlon did not have it bad at work. (Plaint.'s 56.1(b)(3) Statement ¶ 6). Scanlon believes that Brown ignored his complaints because Scanlon is white. (Id., ¶ 12).

As to Takagi, who is Asian, Scanlon testified that Takagi discriminated against him from 2000 to 2002 by failing to take action although he had knowledge of Scanlon's complaints of "abuse" by certain supervisors and that Takagi knew that Scanlon reported such abuse to Brown and that Brown did nothing about the abuse. Takagi did not take any action against Brown because of Brown's race and ignored Scanlon's complaint because of Scanlon's race. (Def.'s 56.1(a)(3) Statement ¶¶ 66- 67). Scanlon believes that Takagi would laugh when Scanlon said it was tough on him because he is white. (Plaint.'s 56.1(b)(3) Statement ¶ 10).

Scanlon first met with Takagi, Lee, and Brown at Takagi's office at the CTA's 95th Street terminal in 2001 regarding Scanlon's concerns. At this meeting, Scanlon requested a transfer, telling the supervisors that he had been subjected to verbal abuse and felt under physical threat from certain managers and supervisors. (Id., ¶ 68). Later in 2001 or early 2002, Scanlon met again with Takagi and discussed his concerns that an African-American employee, Devon Williams, had been allowed to skip a random drug test by Brown, an African-American manager. (Id., ¶¶ 69-70). Scanlon again requested a transfer. Brown told Scanlon that Scanlon wanted to be transferred to the Orange Line

10

in order "to go out by all those white managers on the Orange Line." Scanlon denied that his reason for requesting a transfer had anything to do with the race of the managers on the Orange Line. (Id., ¶ 71). Brown denied making the comments. (Id., ¶ 78).

As to Heard, an African-American Manager, Scanlon testified that Heard kept Scanlon out of service and referred Scanlon to meet with Takagi as a result of Scanlon's absenteeism because of Scanlon's race. (Def.'s 56.1(a)(3) Statement ¶ ). Scanlon also believes that he was disciplined about of his absenteeism by Smith in June 2001 because Scanlon had told Smith that Jefferey was never charged with any discipline as a result of the reports Scanlon had filed. At this June 2001 meeting, Smith made reference to Scanlon's neighborhood and stated "blame it on Daley" regarding Scanlon's discipline. (Id., ¶¶ 81-83).

Mooney, a Caucasian Vice President of the CTA, discriminated against Scanlon because Mooney ignored Scanlon's "cries for help" when Scanlon complained that he was discriminated against because of his race. (Def.'s 561.1 (a)(3) Statement ¶¶ 118-119). Furthermore, Mooney discharged Scanlon for lesser conduct than that taken by Jefferey, Jackie Hubbard, and Joe Dibias. (Id., ¶ 120).

Kidd, an African-American Manager, discriminated against Scanlon because Kidd failed to charge Jefferey with misconduct. (Def.'s 56.1(a)(3) Statement ¶ 123). Edwards, another African-American Manager, discriminated against Scanlon when Edwards sent Scanlon for a special medical exam on November 1, 2000, and because Edwards ignored Scanlon's belief that he was under the threat of physical violence because of his race. (Id., ¶¶ 124-125). During a conversation with Edwards, Edwards told Scanlon that "he didn't want to get into the race thing" when Scanlon complained that he felt he was subjected to race discrimination. (Id., ¶ 142). Coley, an African-

American Manager discriminated against Scanlon when Coley arranged for a white manager, Reilly, to suspend Scanlon in April 2002. Scanlon's belief stems from Reilly's alleged comment that Coley was making Reilly suspend Scanlon. (Id., ¶¶ 127-129).

Scanlon was also discriminated against by a co-worker, Williams, when Williams threatened him, called him a "white motherfucker" and a "cracker" and stated "I'll kill your white ass." (Def.'s 56.1(a)(3) Statement ¶ 130). Williams walked a block-and-a-half to make the threats. (Plaint.'s 56.1(b)(3) Statement ¶ 2). After this incident, Brown interviewed Scanlon and Williams. (Def.'s 56.1(a)(3) Statement ¶ 131). During the interview, Scanlon stated that he would continue to pursue a complaint he had filed with the CTA management regarding Williams' conduct unless Williams apologized. Williams apologized, and Scanlon and Williams may have shook hands. (Id., ¶ 132). After a meeting between Scanlon, Williams, and the CTA management, Scanlon ripped up a report he had given to the CTA management regarding this incident. (Id., ¶ 133). No disciplinary action was taken against Williams or Scanlon. (Plaint's 56.1(b)(3) Statement ¶ 3).

Scanlon believes that he was retaliated against and every charge against him was "taken to the nth degree" and every charge he made against someone was ignored. (Def.'s 56.1(a)(3) Statement ¶ 138). Brown also asked Scanlon why he had gone to the CTA's Affirmative Action Department. (Id.,¶ 140). Furthermore, Scanlon believes that he was suspended in April 2002, in retaliation for his complaint that he made to the CTA's Affirmative Action Department about an incident between Jefferey and a female CTA worker on or about March 14, 2002. Five days after making the report, Scanlon was taken out of service. (Id., ¶¶ 143-144).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

Defendant argues that Scanlon's hostile work environment is time-barred.

A plaintiff must file a charge of discrimination with the EEOC or equivalent state agency within 300 days after the "alleged unlawful practice." 42 U.S.C. § 2000e-5(e)(1). The 300-day limit begins to run when the defendant has taken the action that injures the plaintiff and when the plaintiff knows she has been injured. *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001). A timely hostile work environment claim may be based, in part, on events occurring more than 300 days before the filing of a charge if all of the acts "which constitute the claim are part of the same unlawful practice and at least one act falls within the time period." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (1980).

Scanlon filed his EEOC charge on September 20, 2002. Therefore, his hostile environment claim is timely as long as at least one act falls within the 300-day time period – on or before

13

November 23, 2001. Plaintiff argues that his hostile work environment claim is timely because his suspension in April and May 2002 were part of the racially charged hostile work environment and such occurred within 300 days of his filing his charge of discrimination. Scanlon's suspension and termination were the only alleged acts that occurred within the 300-day time period. However, while Scanlon alleges that he was suspended and terminated because of his race, his suspension and termination were not acts creating a hostile work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (a hostile work environment exists where a workplace is permeated with discriminatory, intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive working environment). Accordingly, Scanlon's hostile work environment claim is untimely.

Even if Scanlon's hostile environment claim was timely, the claim would fail. To establish a hostile work environment claim under Title VII, a plaintiff must prove: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's race; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII

is not directed against unpleasantness *per se* but rather against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998), *quoting Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994).

Scanlon relies on a few isolated incidents to support his hostile environment claim. In June 2000, Jefferey "exploded" at Scanlon. Jefferey did not make any racial comments; but Scanlon infers race was a motivating factor because Jefferey looked enraged when he yelled at him, and Jefferey did not have the same look with the employees he was speaking with before Scanlon. After reporting the incident, a meeting took place where Scanlon stated he just wanted an apology - which he received. Over a year later, in September 2001, Jefferey again yelled at Scanlon. Again, no racial comments were made. Some time later, Jefferey rode on a train driven by Scanlon, and Jefferey "smirked" when he spoke to Scanlon.

Scanlon also cites to an incident with Williams in which he was sworn at and was threatened. Scanlon does not indicate when this incident occurred. While this incident included a physical threat, no racial comments were made; and it was an isolated incident.

Lastly, Scanlon argues that his cries for help from management that went unanswered constituted a hostile work environment. However, the undisputed facts demonstrate that Scanlon's managers addressed the incidents Scanlon has identified as creating a hostile work environment and that Scanlon did not indicate in the meetings with managers that the complained of conduct was because of Scanlon's race. Scanlon cannot rely on unsubstantiated conclusions that he continuously complained about how he was treated and that his managers ignored his requests.

Scanlon has failed to demonstrate that the isolated occurrences that spanned over two-years' time were sufficiently severe or pervasive so as to alter the conditions of his employment and create

an abusive working environment. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (ten offensive comments, only four of which were sexual in nature, over several months were insufficient to make work environment objectively offensive). Accordingly, even if the hostile work environment claim was timely, it would fail.

Defendant argues that Scanlon's age discrimination and retaliation claims fail because they fall outside the scope of his EEOC complaint.

Title VII plaintiffs must initially bring a charge with the appropriate administrative body, *i.e.*, EEOC, EEO, before pursuing a claim in federal court; and, thus, Title VII claims cannot be brought if they were not included in the plaintiff's EEOC complaint. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) (*Babrocky*). An exception to this general rule, which allows a claim not included in the EEOC complaint to be pursued in federal court, exists when that subsequent claim is "reasonably related" to the claim that was included in the EEOC charge. *Babrocky*, 773 F.2d at 864. To be reasonably related, a factual relationship must exist between both claims; specifically, a claim in a Title VII plaintiff's complaint and an EEOC charge are reasonably related when the subsequent claim can be reasonably expected to be developed from an investigation of the allegations in the EEOC charge. *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

Courts will give Title VII *pro se* plaintiffs leeway in regards to the administrative specificity requirement in EEOC complaints. The basis for this liberal construction is to give *pro se* plaintiffs leeway by construing their allegations in light of the strongest arguments that they may suggest when deciding whether the claims in the complaint are encompassed by the EEOC charge. *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998).

16

In the instant case, Scanlon's EEOC complaint alleges that he has been harassed because of his race and that after he complained about the harassment, he was suspended for several weeks. He also alleges that Defendant refused to address his concerns and that his employment was terminated. Based on these allegations, Scanlon's retaliation claim could reasonably be expected to be developed from an investigation of the allegations in the EEOC complaint. However, the EEOC complaint contains no allegations of Scanlon's being treated differently because of his age; and Scanlon did not complain to Defendant about being treated differently because of his age.[1] Accordingly, such allegations could not reasonably be expected to be developed from an investigation of the allegations of the EEOC complaint; and Scanlon's age discrimination claim fails.

Alternatively, Defendant argues that Scanlon has failed to establish a *prima facie* case of retaliation.

Title VII prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (*Hilt-Dyson*). Scanlon presents no direct evidence of retaliation; therefore, his claim is evaluated under the indirect method.

Under the indirect methodology, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite meeting his employer's legitimate job expectations, he suffered an adverse employment action; and (4) he was treated less favorably

---

[1] Scanlon does not address his age discrimination claim in his response to Defendant's Motion for Summary Judgment.

17

than similarly situated employees who did not engage in statutorily protected activity. Failure to satisfy any element of the *prima facie* case is fatal to a plaintiff's claim. *See Hilt-Dyson*, 282 F.3d at 465. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Hilt-Dyson*, 282 F.3d at 465.

Defendant argues that Scanlon was not meeting Defendant's legitimate expectations at the time of his charge because of the threatening and disparaging remarks Scanlon left on Curtis's voice mail. Pursuant to the CTA's Corrective Action Guidelines, Scanlon could be, and was, discharged for the threatening and disparaging remarks. Scanlon does not dispute that he left the messages or their content. Based on the undisputed facts, Scanlon has failed to demonstrate that he was meeting his employer's legitimate expectations.

Furthermore, even if Scanlon had established a *prima facie* case of retaliation, he has failed to demonstrate that Defendant's proffered reason for his termination was a pretext for discrimination. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995) (*Russell*). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

Scanlon concedes the content of the voice mail messages and that he left the messages on another employee's voice mail system. Scanlon argues that the Defendant misconstrued the messages. Even if Defendant had misconstrued the messages, such a mistake does not constitute pretext to discrimination. *See Russell*, 51 F.3d at 68.

Scanlon's failure to meet Defendant's legitimate expectations and his failure to demonstrate that Defendant's reason for terminating Scanlon's employment were a pretext to discrimination also defeat his claim of racial discrimination. Similar to his retaliation claim, Scanlon can prove discrimination through either direct or circumstantial evidence or the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). Direct evidence is defined as "evidence 'which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997) (citation omitted). In an employment discrimination case, direct evidence must speak directly to the issue of discriminatory intent; and it must relate to the specific employment decision in question. *Cowen v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Scanlon has not presented any direct evidence of discrimination; thus, the focus is on the *McDonnell Douglas* burden-shifting method.

Under the *McDonnell Douglas* burden-shifting test, the plaintiff must first establish a *prima facie* case by the preponderance of the evidence. *Jackson*, 176 F.3d at 982. If the plaintiff establishes a *prima facie* case, a rebuttable presumption is created; and the employer must come forward with evidence of a legitimate, nondiscriminatory reason for its actions. If the employer meets this requirement, the burden shifts back to the plaintiff to demonstrate, again, by a

preponderance of the evidence, that the reasons proffered by the employer are actually a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998) (*Adreani*).

To establish a *prima facie* case of race discrimination, a plaintiff must establish: (1) that he was a member of a protected class, (2) that he was performing his job satisfactorily, (3) that he experienced an adverse employment action, and (4) that similarly situated individuals were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). Furthermore, in cases alleging reverse discrimination, a plaintiff must show "background circumstances" that demonstrate that a particular employer has "reason or inclination to discriminate invidiously against whites" or evidence that "there is something 'fishy' about the facts at hand." *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003).

As discussed above, Scanlon was not meeting Defendant's legitimate expectations; and he has failed to demonstrate that the reason for his termination was a pretext to discrimination. Accordingly, Scanlon's racial discrimination claim also fails.[2]

## CONCLUSION

For the reasons stated above, the CTA's Motion for Summary Judgment is granted.

Dated: February 9, 2005

JOHN W. DARRAH
United States District Judge

---

[2] Assuming Scanlon's age discrimination claim was not barred for failing to include the claim in his EEOC complaint, this claim would also fail on these same grounds.

20